Samuel C. POLLINA, DMD, and New
Dimensions Dentistry & Ortho-
dontics, P.C., Appellees

v.

Debra DISHONG and Arthur
A. Kravitz, DMD.

Appeal of Arthur A. Kravitz, DMD.

Superior Court of Pennsylvania.

Argued May 21, 2014.

Filed July 22, 2014.

Reargument Denied Sept. 26, 2014.

Jeffrey J. Wetzel, Pittsburgh, for appellant.

Joel C. Seelye, Altoona, for Dishong, appellee.

Ronald P. Carnevali, Jr., Johnstown, for New Dimensions, appellee.

BEFORE: DONOHUE, OTT and MUSMANNO, JJ.

OPINION BY MUSMANNO, J.:

Arthur A. Kravitz, DMD ("Kravitz") appeals the Order denying, in part, his Preliminary Objections to the Amended Complaint filed by Samuel C. Pollina, DMD ("Pollina") and New Dimensions Dentistry & Orthodontics, P.C. ("New Dimensions") (collectively "Plaintiffs"). After careful consideration, we affirm the trial court's Order.

Pursuant to the averments of the Amended Complaint, Pollina, a licensed dentist, and his corporation, New Dimensions, operated a successful and thriving dental practice in Johnstown, Pennsylvania that provided dental care and services to beneficiaries of Pennsylvania's Medical Assistance Program ("MA" or "MA Program"). Amended Complaint, 11/29/12, at ¶¶ 1–3, 8, 17–18. On March 3, 2010, Pollina expressed his concerns to Debra Dishong ("Dishong"), the office manager of New Dimensions, that the corporation's cash drawer was not being balanced every day. *Id.* at ¶¶ 9–10. Thereafter, Dishong's work attendance became sporadic. *Id.* at ¶ 11. On March 30, 2010, Pollina terminated Dishong's employment. *Id.* at ¶ 12. In response, Dishong threatened to contact various federal and state agencies, including the Department of Public Welfare ("DPW"),[1] regarding Pollina's business practices. *Id.* at ¶ 13.

In April 2010, Dishong contacted the Bureau of Program Integrity ("BPI"), a bureau within the DPW designated with primary responsibility to investigate allegations of misconduct by MA providers. *Id.* at ¶¶ 19, 22. Dishong alleged that Pollina was unlawfully prescribing high volumes of controlled substances to MA recipients and billing the MA Program for unnecessary and/or substandard dental procedures. *Id.* at ¶ 22. Upon receipt of Dishong's allegations, the BPI initiated an investigation of Plaintiffs. *Id.* at ¶ 23.

Thereafter, the BPI conducted an unannounced inspection of New Dimensions. *Id.* at ¶ 28. During its inspection, the BPI interviewed employees of New Dimensions, removed approximately seventy-eight patient files and obtained six months of dental supply invoices. *Id.* at ¶¶ 30, 31. As the BPI's dental consultant, Kravitz, a licensed dentist, attended the BPI inspection, participated in the interviews of New Dimensions's employees, reviewed the DPW electronic claims records and data (including Pollina's prescriptions to dental patients), and reviewed the seventy-eight patient files removed from New Dimensions's office. *Id.* at ¶¶ 5, 29, 32. Upon completion of his review of these materials, Kravitz issued an analysis and opinion to

---

[1] The DPW is the Pennsylvania state agency responsible for the administration of the MA Program, through which federal funds are used to make medical services, including dental services, available to indigent, elderly and disabled individuals. Amended Complaint, 11/29/12, at ¶¶ 14–15. Pursuant to a Provider Agreement with the DPW, Pollina and New Dimensions provided dental services to MA recipients, and thereafter received payment for such services from the DPW. *Id.* at ¶¶ 16–18.

the BPI that was critical of Pollina's dental care and supported his opinion that a credible allegation of fraud had been made against Plaintiffs. *Id.* at ¶ 33. Specifically, Kravitz opined that Plaintiffs: prescribed excessive quantities of controlled substances for simple dental procedures; prescribed anti-psychotic and anti-depressant drugs not ordinarily prescribed by dentists; conducted dental procedures below the standard of acceptable dental treatment; and may have submitted multiple claims for dental services which were of little or no benefit to the recipient, below accepted medical/dental treatment standards, not medically necessary, not rendered, or which misrepresented the description of services, supplies or equipment dispensed or provided. *Id.* at ¶ 56.

Based on Dishong's allegations and Kravitz's analysis and opinion, the BPI concluded that there were credible allegations that Plaintiffs had committed fraud in connection with the MA Program. *Id.* at ¶¶ 34, 36. The BPI then referred the matter to the Office of the Pennsylvania Attorney General's Medicaid Fraud Control Section ("MFCS"), which investigates and prosecutes fraud committed by MA providers. *Id.* at ¶¶ 20, 35. The MFCS accepted the referral and initiated its own investigation of Plaintiffs. *Id.* at ¶ 35.

Additionally, on October 14, 2011, the BPI sent a letter to Plaintiffs advising that it had suspended their MA payments. *Id.* at ¶¶ 36–37. The letter further advised that the BPI had received credible allegations that Plaintiffs had engaged in fraudulent behavior related to dental services and prescriptions for controlled substances. The alleged fraudulent actions included, *inter alia,* knowingly or intentionally submitting false information for the purpose of obtaining greater compensations, submitting claims for services not rendered, submitting claims for services that were below accepted medical/dental treatment standards, submitting claims which misrepresented the descriptions of the supplies or equipment dispensed or provided, and prescribing controlled substances that were not medically necessary and/or in amounts that exceeded the recipient's needs. *Id.* at ¶ 38.

Due to the suspension of MA payments, New Dimensions became unable to meet its payroll obligations, and Pollina was forced to lay-off all but three of New Dimensions's employees, whose employment was reduced to part-time. *Id.* at ¶ 42. Additionally, as a result of the MA payment suspension, and the resultant losses to his dental practice and business, Pollina suffered severe emotional distress, requiring medical care and treatment for migraine headaches and depression. *Id.* at ¶ 66.

Plaintiffs appealed the MA payment suspension with the Bureau of Hearings and Appeals ("BHA"), another bureau within the DPW, asserting that the suspension was not based on credible, substantial or competent evidence. *Id.* at ¶ 39. Additionally, in order to contest the fraud allegations, the suspension of MA payments and the MFCS investigation, Plaintiffs hired counsel and retained expert witnesses. *Id.* at ¶ 43. Upon completion of discovery during the appeal process, no evidence supported any contention that Pollina was over-prescribing controlled substances, or that Plaintiffs submitted claims for services that were not documented or warranted, or that they knowingly or intentionally submitted false information for the purpose of obtaining greater compensation. *Id.* at ¶ 44. Accordingly, the MFCS determined that there was insufficient evidence of fraud and closed its file without initiation of any criminal charges. *Id.* at ¶ 45. In April 2012, the BPI notified Plaintiffs that, as a

result of the MFCS's determination, it was terminating the suspension of their MA payments. *Id.* at ¶ 46.

In the Amended Complaint, Plaintiffs asserted claims against Kravitz for professional negligence and intentional infliction of emotional distress. Plaintiffs alleged that Kravitz was negligent in conducting his investigation, and in formulating his opinions regarding Plaintiffs' dental practice, which opinions were false, inaccurate and unsupported. *Id.* at ¶¶ 54–59.[2] Plaintiffs further alleged that Kravitz's actions were outrageous, intentional and/or reckless, and caused severe emotional distress to Pollina, justifying an award of punitive damages. *Id.* at ¶¶ 64–66.

■ In response to the Amended Complaint, Kravitz filed Preliminary Objections asserting, *inter alia*, that his actions are protected by judicial immunity. On June 11, 2013, the trial court denied the majority of the Preliminary Objections filed by Kravitz, including those asserting judicial immunity.[3] On July 17, 2013, pursuant to Kravitz's request, the trial court amended its interlocutory June 11, 2013 Order to certify it for immediate appeal pursuant to 42 Pa.C.S.A. § 702(b). Thereafter, Kravitz petitioned this Court for permission to

appeal the trial court's June 11, 2013 Order, as amended, and this Court granted permission pursuant to 42 Pa.C.S.A. § 702 and Pa.R.A.P. 312.

On appeal, Kravitz raises the following issue for our review:

> I. [Whether] Kravitz is entitled to immunity from civil liability for statements made and/or actions taken while acting as a dental consultant to [the BPI] during or prior to judicial or quasi-judicial proceedings involving audits and/or peer review of dentists seeking reimbursement from the [MA P]rogram [ ] for dental services provided to patients[, thereby requiring that] the trial court's June 11, 2013 Order [ ] be reversed and [P]laintiffs' lawsuit against [ ] Kravitz [be] dismissed with prejudice[?]

Brief for Kravitz at 6.

Our standard of review of an order of the trial court overruling ... preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.

---

2. Plaintiffs also asserted, in their Amended Complaint, that Kravitz contacted Plaintiffs' insurance providers and advised them of the DPW's investigation, the MA payment suspension and of Kravitz's opinions regarding Pollina's dental care, and that based on the information provided by Kravitz, those insurance providers suspended payments to Plaintiffs. Amended Complaint, 11/29/12, at ¶¶ 60–61. However, in response to Kravitz's discovery requests, Plaintiffs conceded that Kravitz did not contact their insurance providers. Thus, these averments will not be considered in our analysis.

3. We note that, pursuant to Pa.R.C.P. 1030(a), immunity from suit is an affirmative defense which must be pleaded in a responsive pleading under the heading "New Matter." *See*

Pa.R.C.P. 1030(a). When a party erroneously asserts this substantive defense in preliminary objections, rather than raising the defense by answer or in new matter, the failure of the opposing party to object to the defective preliminary objections waives the procedural defect and allows the trial court to rule on the preliminary objections. *See Duquesne Slag Products v. Lench*, 490 Pa. 102, 415 A.2d 53, 54 (1980); *Preiser v. Rosenzweig*, 418 Pa.Super. 341, 614 A.2d 303, 305 (1992). Here, Kravitz improperly asserted immunity defenses in his Preliminary Objections to the Amended Complaint. However, Plaintiffs' failure to object to these procedural defects operated as a waiver of such defects, thereby permitting the trial court to rule on the Preliminary Objections.

Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Feingold v. Hendrzak,* 15 A.3d 937, 941 (Pa.Super.2011) (quoting *Haun v. Comty. Health Sys., Inc.,* 14 A.3d 120, 123 (Pa.Super.2011)).

On appeal, Kravitz urges us to consider decisional law from other jurisdictions extending common law immunity to professional peer review groups, and to extend such immunity to Kravitz for his peer review of Plaintiffs' dental practice. Brief for Kravitz at 42–47.

Whether a privilege applies in a given context is a question of law for the court. *Smith v. Griffiths,* 327 Pa.Super. 418, 476 A.2d 22, 25 (1984). When reviewing a question of law, our standard of review is *de novo,* and our scope of review is plenary. *See Christy v. Cranberry Volunteer Ambulance Corps, Inc.,* 579 Pa. 404, 856 A.2d 43, 46 (2004). Here, the question we address is purely legal, and our review does not encompass the merits of the underlying negligence action. *Id.*

■ In seeking peer review immunity, Kravitz inexplicably fails to reference Pennsylvania's Peer Review Protection Act ("PRPA"), 63 P.S. § 425.1 *et seq.,* which provides immunity from civil liability to individuals who furnish professional counsel or services to any review organization. *See* 63 P.S. § 425.3(b). Because Kravitz failed to raise the issue of peer review immunity in his Preliminary Objections, it is waived. *See* Pa.R.A.P. 302(a); *see also Commonwealth v. Nat. Fed'n of the Blind,* 471 Pa. 529, 370 A.2d 732, 736 (1977) (holding that issues not raised in preliminary objections and raised for the first time on appeal were waived); *Matter of Franklin Twp. Bd. of Supervisors,* 475 Pa. 65, 379 A.2d 874 (1977) (same).

■ Moreover, even if Kravitz had properly preserved this issue, we would have declined to follow decisional law from other jurisdictions for the reason that the Pennsylvania Legislature, in enacting the PRPA, has explicitly determined that individuals, such as Kravitz, who have furnished professional counsel or services to a review organization, such as the BPI, are not immune from civil liability if they fail to exercise due care. *See* 63 P.S. § 425.3(b) (conditioning peer review immunity on the exercise of due care). Because the crux of Plaintiffs' claims against Kravitz is that he failed to exercise due care in his investigation, analysis and opinion to the BPI, Kravitz is not entitled to immunity from civil liability as a provider of professional peer review services.

Kravitz next argues that judicial immunity bars Plaintiffs' claims against him because his allegedly negligent conduct is related to judicial proceedings. Brief for Kravitz at 25, 31.

■ Pursuant to the judicial privilege, statements made in pleadings, as well as in the actual trial or argument of a case, are absolutely privileged, and the maker of the statements is immune from legal action as long as the statements are issued *in the regular course of judicial proceedings* and are *pertinent and material to the redress or relief sought. Post v. Mendel,* 510 Pa.

213, 507 A.2d 351, 353, 355 (1986). The judicial privilege also extends to statements made prior to judicial proceedings, provided that they are pertinent and material to, and issued in the regular course of preparing for, *contemplated* judicial proceedings. *Id.* at 356.

> The reasons for the absolute privilege are well recognized. A judge must be free to administer the law without fear of consequences. This independence would be impaired were he to be in daily apprehension of defamation suits. The privilege is also extended to parties to afford freedom of access to the courts, to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests. Likewise, the privilege exists because the courts have other internal sanctions against defamatory statements, such as perjury or contempt proceedings.

*Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 56 (1971); *see also Post*, 507 A.2d at 355.[4] Thus, the privilege exists because there is a realm of communication essential to the exploration of legal claims that would be hindered were there not the protection afforded by the privilege. *Post*, 507 A.2d at 355.

■ In applying the above principles to the instant case, we conclude that Kravitz's investigation, analysis and formulation of opinions for the BPI were not performed "in the regular course of judicial proceedings" nor "pertinent and material to the redress or relief sought" in any judicial proceeding. *Id.* At the time of the BPI investigation, no lawsuit or other judicial proceeding regarding Plaintiffs' participation in the MA Program was pending, nor was any such judicial proceeding contemplated or subsequently initiated.[5] Moreover, Kravitz did not perform his investigation, conduct his analysis or provide his opinions to the BPI for the sole purpose of initiating criminal proceedings against Plaintiffs.[6] Thus, Kravitz's investi-

---

4. Pennsylvania jurisprudence has also extended the judicial privilege to individuals assisting judges in performing their adjudicatory functions as well as those interacting with such individuals. *See Smith v. Griffiths*, 327 Pa.Super. 418, 476 A.2d 22, 24–25 (1994) (holding that letters written by divorce counsel on behalf of his client to a hearing officer appointed to hear certain divorce issues were absolutely privileged as pertinent to the divorce proceedings); *Feingold v. Hill*, 360 Pa.Super. 539, 521 A.2d 33, 38 (1987) (extending the cloak of immunity to a judge's law clerk performing official duties).

5. We note that, even when judicial proceedings are pending, our courts have narrowly applied the privilege and have refused to extend judicial immunity to communications which, although concerning the lawsuit, were not issued in the regular course of the legal proceedings or pertinent or material to the proceedings. *See Post*, 507 A.2d at 356 (holding that an attorney's act in sending a letter detailing acts of misconduct by his opposing counsel to the presiding judge, the Disciplin-

ary Board, opposing counsel and a client of opposing counsel, was not subject to judicial immunity because it was neither issued in the regular course of the legal proceedings nor pertinent to the proceedings); *see also Bochetto v. Gibson*, 580 Pa. 245, 860 A.2d 67, 72 (2004) (holding that an attorney's act in sending a copy of the complaint to a reporter was not privileged because it was an act that occurred outside of the regular course of the judicial proceedings).

6. On appeal, Kravitz also claims that his investigation, analysis and provision of opinions to the BPI are akin to statements made by individuals reporting problems to officials that trigger commencement of judicial proceedings, and that he should be afforded the immunity extended to such statements. Brief for Kravitz at 30–32. However, the record reflects that Kravitz's investigation and report to the BPI were not statements made by a private party to law enforcement officials for the sole purpose of initiating criminal proceedings. *See Pawlowski v. Smorto*, 403 Pa.Super. 71, 588 A.2d 36, 42 (1991). Rath-

gation, analysis and provision of opinions to the BPI were extra-judicial acts that occurred outside the course of any pending or impending judicial proceeding. Because there is no evidence that Kravitz's actions were performed in relation to any judicial proceeding, pending or impending, judicial immunity does not apply.[7]

However, our conclusion does not end our inquiry, as Kravitz alternatively claims that his actions are protected by quasi-judicial immunity.

■ Pennsylvania recognizes quasi-judicial immunity for state administrative agency officials performing quasi-judicial or quasi-prosecutorial actions in relation to a quasi-judicial proceeding. *Petition of Dwyer*, 486 Pa. 585, 406 A.2d 1355, 1360 (1979) (holding that members of the Industrial Board of the Department of Labor and Industry, who were empowered to hold hearings, issue subpoenas, administer oaths and exercise discretion in granting extensions and variances and in deciding whether to initiate enforcement proceedings, were entitled to quasi-judicial immunity from criminal liability for granting extensions and variances for certain fire safety violations). As noted by the Pennsylvania Supreme Court in *Dwyer*,

the modern era has ushered into our system of jurisprudence men and women who, in administrative agency proceedings, performed adjudicatory functions much the same as those performed by judges. These men and women are called upon to exercise their discretion in applying statutes, rules, and often case law governing the particular administrative agency area to the facts and circumstances of each proceeding. The question has recently arisen, as it has here, as to the propriety of adoption of a "quasi-judicial" immunity to preserve the independence of these administrative agency officials in rendering their decisions.

*Id.* at 1358. The *Dwyer* Court reasoned that quasi-judicial immunity, like judicial immunity, is necessary to ensure that agency adjudicatory decisions will be rendered independently, free from external pressures, harassment or intimidation. *Id.* at 1359. In deciding whether the adjudicatory functions of agency officials are functionally equivalent to the role of the judiciary, we look to the presence and exercise of discretionary decision-making authority (*i.e.,* applying the law, rules and regulations to the factual matrix of a given

---

er, the record reflects that Kravitz's actions were performed as an independent contractor hired as a consultant by the BPI for the purpose of providing his professional opinions to the BPI. Thus, Kravitz was contractually obligated to provide his opinions to the BPI pursuant to a business arrangement. There is no evidence that Kravitz's report to the BPI was motivated solely by an intent to initiate criminal charges against Plaintiffs.

7. We note that Kravitz has relied on several cases addressing the application of judicial immunity to expert witnesses, court-appointed witnesses, court-appointed advocates, and government witnesses for their participation, including the provision of in-court testimony, in pending or contemplated judicial proceedings. Brief for Kravitz at 35–42. However,

Kravitz's reliance on these cases is misplaced, as his actions were unrelated to any judicial proceeding, pending or contemplated, and he was not appointed by any court to serve as a witness or advocate in relation to any judicial proceeding. Kravitz also contends that the trial court erred by relying on *Bochetto* when denying his Preliminary Objections. *Bochetto* involved the question of whether judicial immunity should apply to extra-judicial acts performed by counsel participating in a judicial proceeding. As the facts of this case are unrelated to those presented in *Bochetto*, we conclude that *Bochetto* is not controlling. However, we may affirm the trial court's ruling on any proper basis. *See Carrozza v. Greenbaum*, 591 Pa. 196, 916 A.2d 553, 569 (2007).

case) as well as the existence of procedural safeguards in the administrative proceeding similar to the safeguards afforded at a judicial proceeding (e.g., notice, hearing, right to cross-examine witnesses, etc.). *Dwyer,* 406 A.2d at 1360.

Since *Dwyer,* Pennsylvania courts have extended quasi-judicial immunity to other administrative officials acting in an adjudicatory capacity. *See Myers v. Dept. of Labor and Indus.,* 312 Pa.Super. 61, 458 A.2d 235, 238 (1983) (holding that a workmen's compensation referee was acting as a quasi-judicial officer, and was absolutely immune from liability for his statutorily assigned tasks); *Urbano v. Meneses,* 288 Pa.Super. 103, 431 A.2d 308, 311 (1981) (holding that zoning board members, when ruling on an individual application for a zoning permit, were acting in a quasi-judicial capacity and were entitled to quasi-judicial immunity). Quasi-judicial immunity has also been extended to witnesses testifying at an administrative adjudicatory hearing. *See Doe v. Wyoming Valley Health Care Sys., Inc.,* 987 A.2d 758, 766–68 (Pa.Super.2009) (concluding that judicial immunity applied to a witness who testified at a National Labor Relations Board employment hearing).

Here, Kravitz asserts that the BPI investigation, the BPI's suspension of Plaintiffs' MA payments, and Plaintiffs' appeal of the suspension of MA payments each qualify as a quasi-judicial proceeding, entitling him to quasi-judicial immunity in his capacity as a consultant to the BPI. Brief for Kravitz at 32–35. In support, Kravitz contends that the DPW's comprehensive scheme to regulate the MA Program is quasi-judicial in nature, noting its investigation and peer review of MA provider practices; imposition of sanctions for viola-

tions of MA Program regulations; and referral to the MFCS for investigation of fraudulent provider activity and possible initiation of enforcement actions. *Id.* at 25–30. Kravitz further contends that Plaintiffs' appeal of the suspension of MA payments qualifies as a quasi-judicial proceeding because legal counsel and expert witnesses were retained, pleadings were exchanged, discovery was conducted, depositions were taken (including Kravitz's deposition), and an agency official conducted a quasi-judicial proceeding before determining that Plaintiffs' MA payment privileges should be reinstated. *Id.* at 31–32. We disagree with Kravitz's contention that these procedures entitle him to quasi-judicial immunity for his investigation, analysis and issuance of an opinion to the BPI.

 In order to determine whether an individual is entitled to quasi-judicial immunity, we must first examine the nature of the actions complained of to ascertain whether they were performed within the quasi-judicial adjudicatory function. *See Myers,* 458 A.2d at 238; *see also Tulio v. Commonwealth, State Horse Racing Comm'n,* 79 Pa.Cmwlth. 305, 470 A.2d 645, 649 (1984).[8] In reviewing Kravitz's claim, we are cognizant that administrative agencies often have a dual role, only part of which can be characterized as quasi-judicial. *See Urbano,* 431 A.2d at 311 (noting that the zoning board had a dual role, partly legislative and partly quasi-judicial, and that judicial immunity would only apply to its quasi-judicial actions). The fact that an administrative agency performs certain adjudicatory functions will not justify the extension of quasi-judicial immunity to non-adjudicatory functions of the same agency. *See id.* Moreover, quasi—judicial immunity will not apply to actions

8. Although decisions of the Pennsylvania Commonwealth Court are not binding on this Court, they may serve as persuasive authority.

*See Oswald v. WB Pub. Square Assocs., LLC,* 80 A.3d 790, 795 (Pa.Super.2013).

taken by officials within a quasi-judicial branch of a state administrative agency that fall outside of their adjudicatory function. *See Tulio*, 470 A.2d at 649 (holding that quasi-judicial immunity would not apply to non-adjudicatory actions of the State Horse Racing Commissioner); *see generally Langella v. Cercone*, 34 A.3d 835, 839 (Pa.Super.2011) (holding that administrative, legislative or executive functions performed by a magisterial district judge, even if assigned to the judge by law, are not regarded as purely judicial acts, and are not entitled to judicial immunity).

▆▆▆ In this case, the DPW has a dual role. Its BPI division investigates allegations of misconduct by MA providers, while its BHA division performs adjudicatory functions.[9] The BPI's investigation of Plaintiffs cannot be characterized as a quasi-judicial function, as there is no evidence of record that it shared the characteristics of the adjudicatory process that would justify the application of quasi-judicial immunity. *See Butz v. Economou*, 438 U.S. 478, 513–14, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (requiring the presence and exercise of discretionary decision-making authority and procedural safeguards in order for an administrative agency proceeding to qualify as the functional equivalent as a judicial proceeding); *Dwyer*, 406 A.2d at 1360 (same).

Moreover, the BPI's suspension of Plaintiffs' MA payments cannot be characterized as involving discretionary decision-making authority because the BPI is *required* to suspend MA payments upon a finding that credible allegations of fraud have been made. *See* 42 C.F.R. § 455.23(a)(1) (providing that "[t]he State Medicaid agency *must* suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity.") (emphasis added). Thus, we reject Kravitz's contentions that the BPI's suspension of MA payments to Plaintiffs was a quasi-judicial function or proceeding, or that it provides any basis for the application of quasi-judicial immunity to Kravitz for his participation in the BPI investigation.[10]

▆▆▆ Similarly, we reject Kravitz's contention that Plaintiffs' appeal of the suspension of MA payments to the BHA entitles Kravitz to quasi-judicial immunity for his investigation, analysis and issuance of an opinion to the BPI. Brief for Kravitz at 26–28. Even assuming that Plaintiffs' appeal before the BHA qualifies as a quasi-judicial proceeding, Pennsylvania jurisprudence would only extend judicial immunity to Kravitz for his participation as a witness in the BHA proceedings. *See Doe*, 987 A.2d at 766–68 (extending quasi-judicial immunity to witnesses testifying at an administrative adjudicatory hearing). Here, Plaintiffs do not allege any liability based on Kravitz's participation in the BHA proceedings (*i.e.*, his deposition testimony).

---

9. Pursuant to 55 Pa.Code §§ 41.1 *et seq.*, an appeal before the BHA involves the filing and service of legal documents; discovery in the form of interrogatories, requests for production, requests for admission, expert reports, depositions and dispositive motions; the presentation of witnesses and evidence at hearings before a presiding officer; the issuance of a determination adjudicating the contested issues of law and fact; and the issuance of an appropriate order, decree or decision.

10. For the same reasons, we conclude that the MFCS investigation was not an adjudicatory function of the Office of the Attorney General that would implicate quasi-judicial immunity. Moreover, Kravitz's investigation, analysis and opinion were not performed in relation to the MFCS investigation. Thus, the MFCS investigation affords no quasi-judicial immunity to Kravitz for his investigation and report to the BPI.

Rather, Plaintiffs allege liability against Kravitz based solely on his investigation, analysis and formulation of opinions for the BPI.[11]

■ Further, judicial immunity does not extend to professional negligence actions which are brought against an expert witness when the allegations of negligence are not premised on the substance of the expert's opinion. *LLMD of Michigan, Inc. v. Jackson–Cross Co.*, 559 Pa. 297, 740 A.2d 186, 191 (1999). In *LLMD*, the plaintiff asserted professional malpractice and breach of contract claims against a professional firm that it had retained to provide damage calculations in another lawsuit. The firm made mathematical errors in its damage calculations, which errors were not revealed until trial, during cross-examination of one of the firm's employees who was testifying as an expert witness. In ruling that judicial immunity did not extend to the firm's underlying negligence in making its damage calculations, the Supreme Court stated that

> [t]he goal of ensuring that the path to truth is unobstructed and the judicial

process is protected, by fostering an atmosphere where the expert witness will be forthright and candid in stating his or her opinion, is not advanced by immunizing an expert witness from his or her negligence in formulating that opinion. The judicial process will be enhanced only by requiring that an expert witness render services to the degree of care, skill and proficiency commonly exercised by the ordinarily skillful, careful and prudent members of their profession.

*Id.* at 191.

As in *LLMD*, the professional negligence claims against Kravitz are not based on the substance of his professional opinions or deposition testimony during the BHA appeal. Rather, Plaintiffs' claims against Kravitz are based on his negligence in performing his investigation, conducting his analysis and in formulating his opinions. Therefore, under *LLMD*, neither judicial immunity nor quasi-judicial immunity operates to bar Plaintiffs' professional negligence claims against Kravitz.[12]

---

**11.** Kravitz cites *Milliner v. Enck*, 709 A.2d 417 (Pa.Super.1998), to support his claim that his investigation and report were related to a "judicial or quasi-judicial proceeding." Brief for Kravitz at 24–25, 28, 33. However, Kravitz's reliance on *Milliner* is misplaced, as the parties in that case stipulated that an unemployment compensation hearing was a "judicial proceeding;" hence, the question of whether an administrative agency proceeding qualified as a "judicial proceeding" was not before us. *See id.* at 419. Moreover, *Milliner* involved the question of whether judicial immunity applied to defamatory statements contained in what was essentially the employer's "answer" to the employee's "complaint" for unemployment compensation benefits. *Id.* at 421. Thus, *Milliner* is inapplicable to the facts of this case. Relatedly, other similar cases relied on by Kravitz are inapplicable. *See* Brief for Kravitz at 28, 33–34.

**12.** We note that this conclusion is consistent with rulings made by courts in other jurisdic-

tions that, although one's non-testimonial actions may ultimately lead to witness testimony, such testimony does not serve to cloak non-testimonial actions with absolute testimonial immunity. *See Gregory v. City of Louisville*, 444 F.3d 725, 740–41 (6th Cir.2006) (holding that expert-witness reports exist independently from the witness's judicial testimony, even if the reports are prepared in anticipation for possible judicial proceedings); *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir.1999) (holding that absolutely immunized testimony of a deputy sheriff did not make his underlying non-testimonial actions subject to judicial immunity); *Buckley v. Fitzsimmons*, 20 F.3d 789, 796 (7th Cir.1994) (holding that constitutional wrongs completed out of court are actionable even if they lead to immunized acts); *Mastroianni v. Bowers*, 160 F.3d 671 (11th Cir.1998) (holding that absolute testimonial immunity does not relate backwards to protect a defendant for any activities he engaged in prior to taking the

Because we find no merit to Kravitz's claims on appeal, we conclude that the trial court properly denied his Preliminary Objections to the Amended Complaint.

Order affirmed.

witness stand for his grand jury testimony); *Lewis v. Drouillard,* 704 F.Supp.2d 673 (E.D.Mich.2010) (holding that doctor's testimony before worker's compensation agency did not retroactively shield him from liability for falsified independent medical examination reports).